UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

MAY 02 2017
May 2, 2017
Judge Sharon Johnson Coleman
United States District Court

| UNITED STATES OF AMERICA | |
|---|---|
| v. | No. 15 CR 102 |
| TIMOTHY MASON | Judge Sharon Johnson Coleman |

## PLEA AGREEMENT

1. This Plea Agreement between the Acting United States Attorney for the Northern District of Illinois, JOEL R. LEVIN, and defendant TIMOTHY MASON, and his attorney, PATRICK BLEGEN, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(A), as more fully set forth below. The parties to this Agreement have agreed upon the following:

### Charges in This Case

2. The indictment in this case charges defendant with wire fraud, in violation of Title 18, United States Code, Section 1343 (Counts 1-5).

3. Defendant has read the charges against him contained in the indictment, and those charges have been fully explained to him by his attorney.

4. Defendant fully understands the nature and elements of the crimes with which he has been charged.

### Charge to Which Defendant Is Pleading Guilty

5. By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following count of the indictment: Count One, which charges defendant with wire fraud, in violation of Title 18, United States Code, Section 1343. In

addition, as further provided below, defendant agrees to the entry of a forfeiture judgment.

## **Factual Basis**

6.      Defendant will plead guilty because he is in fact guilty of the charge contained in Count One of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt, and establish a basis for forfeiture of the property described elsewhere in this Plea Agreement:

Beginning no later than August 2010 and continuing until at least September 2012, at Chicago, in the Northern District of Illinois, and elsewhere, defendant Timothy Mason devised, intended to devise, and participated in a scheme to defraud and to obtain money and property from the City of Chicago, State of Pennsylvania Department of Environmental Protection, the Association of Bay Area Governments, and the Bay Area Air Quality Management District by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, in violation of Title 18, United States Code, Section 1343.

More specifically, beginning no later than August 2010, Mason, along with his partner Mariana Gerzanych, formed 350Green LLC, which represented itself as experienced in the installation and operation of plug-in electric vehicle charging stations. Mason served as president of 350Green, while Gerzanych held the title of chief executive officer of 350Green, although both were equal partners in the

2

company. Mason and Gerzanych divided responsibility within the company, with Mason responsible for business growth and financial management, and Gerzanych responsible for public relations, marketing, and overseeing the technical aspects of PEV charger installation.

Mason and Gerzanych, as 350Green, applied for, and were awarded, contracts with cities, states, and other units of government, to install and operate PEV charging stations. These contracts included a commitment by the governmental agency to contribute a portion of the total cost of the project from grant funds.

Mason created the financial statements and projections which were submitted with all of 350Green's grant and contract applications. In these applications, 350Green committed to contribute, from various sources, between three to six times as much money as the governments were to contribute via grant funds in order to complete the projects. As a result of these representations, between 2010 and 2012, 350Green was awarded contracts with the City of Chicago ("Chicago"), the Bay Area Air Quality Management District ("BAAQMD"), the Pennsylvania Department of Environmental Protection ("PADEP"), and the Association of Bay Area Governments ("ABAG") (collectively, the governmental agencies).

Mason was told by Chicago personnel in September 2011 that in order to obtain grant funds from Chicago, 350Green was required to submit proof that it had paid its subcontractors and vendors. Mason knew that, in order to obtain grant funds from PADEP and ABAG, 350Green was required to submit proof that it had paid its

subcontractors and vendors. Mason also knew that BAAQMD required 350Green to submit proof that it had incurred expenses under the grant before 350Green could seek reimbursement from grant funds.

Mason was responsible for the submission of invoices by 350Green to the governmental agencies. Mason directed 350Green Employees A, B, C and D, and Gerzanych, to submit the invoices to the governmental agencies on behalf of 350Green.

### Mason's Submission of False and Fraudulent Invoices

350Green performed on the Chicago and Pennslyvania contracts for a period of time. Beginning in approximately September 2011, 350Green's debts outpaced its income. Mason devised a scheme to obtain grant funds to which 350Green was not entitled by submitting invoices to the governmental entities that represented that vendor and subcontractor payments had been made, when in fact those subcontractors and vendors had not been paid.

In furtherance of his scheme, Mason directed Employee B to create checks, using 350Green check stock, which purported to pay vendors and subcontractors the full amount due from 350Green. Mason directed Employee B to include copies of those checks, along with the vendor and subcontractor invoices, in 350Green's invoices to the governmental agencies. Mason then directed Employee B to hold those checks and not to mail them to the vendors or subcontractors. Mason knew, at the time he caused Employee B, and later other 350Green employees, to submit invoices to the

4

governmental agencies, that the vendors and subcontractors had not in fact been paid for their services.

In addition, in furtherance of the scheme, Mason directed Employee B to create invoices which purported to show that a company named "Actium Power" had supplied DC fast chargers (a type of PEV charger) to 350Green. Mason told Employee B to use the name "Actium Power" on the invoice and to list Actium Power's business address as the address of Manufacturer A, the actual manufacturer of the DC fast chargers. Mason told Employee B to include on the invoice a statement that Actium Power was the "exclusive North American Dealer for Manufacturer A." Mason told Employee B how many chargers and related equipment should be listed on the invoice, and what price to assign to each of those items. Mason further directed Employee B to create checks using 350Green's check stock, which purported to show that 350Green had issued a check in payment to Actium Power for the chargers supplied pursuant to the Actium Power invoices.

When Employee B questioned Mason's instructions, Mason told Employee B that Actium Power was a legitimate company owned by Mason and Gerzanych and that there was no problem with Employee B creating the invoices. Mason further directed Employee B to include the false and fraudulent Actium Power invoices and copies of the false and fraudulent 350Green checks to Actium Power, in 350Green's invoices to the governmental agencies. Mason later directed other employees, as well

as Gerzanych, to submit invoices to the governmental agencies which contained the false and fraudulent Actium Power invoices.

Mason knew that the Actium Power invoices were false, because Mason knew the following: "Actium Power", a company incorporated by Mason and Gerzanych, was a company in name only, had no assets, liabilities, or business, and was not headquartered at the address of Manufacturer A. Actium Power was not the "exclusive North American distributor" for Manufacturer A, and no distribution agreement had been entered into between 350Green, Actium Power, and/or Manufacturer A. Mason also knew that 350Green had obtained the DC fast chargers directly from Manufacturer A and that neither 350Green nor Actium Power had paid Manufacturer A for the DC fast chargers.

Among the false and fraudulent invoices Mason submitted was an invoice to the City of Chicago which claimed reimbursement of approximately $1,065,000, based on payments made to vendors and subcontractors, which payments had not in fact been made. As charged in Count One, this invoice resulted in payment to 350Green by the City, on or about December 27, 2011, of $1,013,453.69. Mason acknowledges that the government can prove that the City's payment to 350Green was made via electronic wire transfer in interstate commerce.

Mason admits that he submitted and caused to be submitted, to each of the governmental agencies, the false invoices, including the invoices from Actium Power

to 350Green, which falsely claimed that 350Green was entitled to reimbursement for costs paid to subcontractors and/or vendors.

### Mason's False Statements to Conceal the Scheme

When subcontractors and vendors complained to 350Green about late payments or a failure to pay, Mason told subcontractors and vendors that payment was late due to the failure of the City of Chicago to pay its invoices on time, although Mason knew at the time he made this statement that this statement was false.

When Chicago personnel overseeing the Chicago grant questioned 350Green's finances, Mason made statements to Chicago personnel and sent emails to Chicago personnel overseeing the grant in which he falsely and fraudulently represented that 350Green's funding issues were resolved or would soon be resolved. Mason knew these statements were false.

When other governmental agencies questioned 350Green's invoices, Mason told state of Pennslyvania personnel, and others, that Employee B and Employee D had made mistakes and those mistakes were the reason for any irregularity in invoicing and that the invoices 350Green had submitted represented expenses that had in fact been incurred and paid, even though Mason knew these statements were false.

When Chicago personnel questioned 350Green as to the reasons for the non-payment of subcontractors and vendors, Mason instructed Gerzanych, whom he believed to have a better relationship with Chicago personnel, to send an email to the

Chicago personnel. In this email, Mason directed Gerzanych to tell the Chicago personnel that 350Green was having problems with payments due to other grant programs not paying on time, although Mason knew at the time that this statement was false. Mason further directed Gerzanych to include financial statements and projections in her email to Chicago personnel purporting to show that 350Green was on solid financial footing. Mason knew, at the time, that the financial statements and projections that he gave to Gerzanych to forward to Chicago personnel falsely represented that 350Green was financially stable.

Further, after allegations of fraud in the Chicago grant were made public in the news media in June 2012, Mason gave the same false financial statements he had provided to Chicago to Gerzanych, who was responsible for public relations and marketing, knowing that Gerzanych would rely upon those financial statements to make public statements to the governmental entities and their employees about the financial condition of 350Green.

Shortly after the allegations of fraud became public, Mason electronically deleted the Actium Power invoices from 350Green's computerized QuickBooks bookkeeping records.

In approximately the summer of 2012, Mason admitted to Gerzanych that he had been submitting invoices to the governmental agencies prior to paying subcontractors and vendors in order to obtain grant funds, including false invoices from "Actium Power." In September 2012, when PADEP personnel challenged the

adequacy of proof supplied in support of 350Green's invoices, Mason emailed Gerzanych a false explanation as to the discrepancy in billing for the DC fast chargers, which included falsely blaming mistakes by Employee B for the errors in billing, and directed Gerzanych to provide the explanation to PADEP personnel. Gerzanych, as instructed by Mason, then emailed that explanation, verbatim, to the PADEP employee overseeing 350Green's grant. Mason instructed Gerzanych to send this email knowing that the statements contained in the email were false.

Defendant acknowledges that the government will argue at sentencing that, by means of the above-described fraud, defendant intended to draw down on grant funds totaling over $1.5 million to which he knew he was not entitled. Defendant reserves the right to disagree with the government's position as to the amount of intended and actual loss caused by his scheme.

<u>**Maximum Statutory Penalties**</u>

7.     Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a.     A maximum sentence of 20 years' imprisonment. This offense also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that the judge also may impose a term of supervised release of not more than three years.

b.     Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court.

c.   In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty or restitution imposed.

## Sentencing Guidelines Calculations

8.   Defendant understands that in determining a sentence, the Court is obligated to calculate the applicable Sentencing Guidelines range, and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), which include: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) the kinds of sentences available; (iv) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to any victim of the offense.

9.   For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.   **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following

statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2016 Guidelines Manual.

      b.    **Offense Level Calculations**.

          i.    The base offense level is 7, pursuant to Guideline § 2B1.1(a)(1).

          ii.    The offense level is increased by 16 levels, pursuant to Guideline §2B1.1(b)(1)(I), because the offense involved loss of more than $1,500,000 but less than $3,500,000. The defendant reserves the right to contest the loss amount.

          iii.    The offense level is increased by 2 levels, pursuant to Guideline §2B1.1(b)(10) because the offense involved sophisticated means.

          iv.    The offense level is increased by 2 levels, pursuant to Guideline §3B1.1(c), because defendant was an organizer, leader, manager or supervisor in the criminal activity.

          v.    Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to

satisfy any fine or restitution that may be imposed in this case, a two-level reduction in the offense level is appropriate.

vi.     In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c.     **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

d.     **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, it is the government's position that the anticipated offense level is 24, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 51 to 63 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

e.     Defendant and his attorney and the government acknowledge that the above guidelines calculations are preliminary in nature, and are non-binding

predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government or the defendant and his attorney to conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

10.    Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

### Agreements Relating to Sentencing

11.    Each party is free to recommend whatever sentence it deems appropriate.

12.    It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

13.    Regarding restitution, defendant acknowledges that pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant to make full restitution to the victim governmental agencies in an amount to be determined by the Court at sentencing, which amount shall reflect credit for any funds repaid prior to sentencing.

14.    Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to Title 18, United States Code, Section 3664(k), he is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect his ability to pay restitution.

15.    Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

16.    Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code,

Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

17.    After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the indictment as to defendant.

### Forfeiture

18.    Defendant understands that by pleading guilty, he will subject to forfeiture to the United States all right, title, and interest that he has in any property constituting or derived from proceeds obtained, directly or indirectly, as a result of the offense.

19.    Defendant agrees to the entry of a personal money judgment in an amount to be determined by the Court at sentencing. Defendant consents to the immediate entry of a preliminary order of forfeiture setting forth the amount of the personal money judgment he will be ordered to pay.

20.    Defendant admits that because the directly forfeitable property is no longer available for forfeiture as described in Title 21, United States Code, Section 853(p)(1), the United States is entitled to seek forfeiture of any other property of defendant, up to the value of the personal money judgment, as substitute assets pursuant to Title 21, United States Code, Section 853(p)(2).

21.    Defendant understands that forfeiture shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the

Court may impose upon defendant in addition to the forfeiture judgment. In this case, however, the United States Attorney's Office will recommend to the Attorney General that any net proceeds derived from any forfeited assets be remitted or restored to eligible victims of the offense pursuant to Title 18, United States Code, Section 981(e), Title 28, Code of Federal Regulations, Part 9, and other applicable law.

### Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

22.    This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 15 CR 102.

23.    This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

24.    Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.  **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

   i.   The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

   ii.   If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

   iii.   If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

   iv.   If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering

each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v. At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi. At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii. At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

b. **Appellate rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial, and may only appeal the validity of this plea of guilty and the sentence imposed. Defendant understands that any appeal must be filed within 14 calendar days of the entry of the judgment of conviction.

25. Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs, with the exception of the appellate rights

specifically preserved above. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

26.     Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing.

27.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

28.     For the purpose of monitoring defendant's compliance with his obligations to pay a fine and restitution during any term of supervised release or

probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

29.    Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

30.    Defendant understands that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

## Conclusion

31.    Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

32.  Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement.

33.  Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

34.  Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

35.  Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

36.     Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.


AGREED THIS DATE: ___5/2/17___


_Joel R Levin by WJBarsella_
JOEL R. LEVIN
Acting United States Attorney

_MAUREEN MERIN_
MAUREEN MERIN
Assistant U.S. Attorney

_____
TIMOTHY MASON
Defendant

_____
PATRICK BLEGEN
Attorney for Defendant