**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15 CR 102 |
| | ) | Hon. Sharon Johnson Coleman |
| TIMOTHY MASON, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT TIMOTHY MASON'S OBJECTIONS TO THE PRESENTENCE
INVESTIGATION REPORT AND POSITION PAPER ON SENTENCING**

Defendant, TIMOTHY MASON, by and through his attorneys, BLEGEN & GARVEY,

and pursuant to Rule 32 of the Federal Rules of Criminal Procedure, and 18 U.S.C. § 3553(a), as

well as the Sixth Amendment to the Constitution of the United States and the Supreme Court's

opinion in *United States v. Booker*, 543 U.S. 220 (2005), respectfully submits the following

objections to the Presentence Investigation Report ("PSR") and position paper on sentencing.[1]

## I.     Introduction

The Court is no doubt familiar with the wide sentencing discretion provided under

§ 3553(a) since the Supreme Court decided *Booker* and reiterated that discretion in cases such as

*United States v. Rita*, 551 U.S. 338 (2007), and *Gall v. United States*, 552 U.S. 38 (2007)[2].  The

---

[1] Sentencing memos were scheduled to be filed in this case on September 8, 2017.  The defense requests leave to file this memo instanter as additional time was required to incorporate recently received financial work papers related to the loss calculation.  The government has indicated that it does not object to this request and will not require additional time to file a response – currently scheduled for September 15, 2017.

[2] The *Gall* court explained the post-*Booker* sentencing procedure as follows:

> "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines.   As a matter of administration and to ensure nationwide consistency, the Guidelines should be starting point and the initial benchmark.  The Guidelines are not the only consideration, however.  Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In doing so, he may not presume that the Guidelines range is reasonable.  He must make an individualized assessment based on the facts

statutory sentencing factors found in § 3553(a) provide the Court with the framework upon which to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing by taking into account, among other things, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to satisfy the purposes of sentencing.

The PSR has calculated Mr. Mason's total offense level to be 24. For the reasons stated below, the defense submits the total offense level should be 22. When combined with Criminal History Category I, this yields a guideline range of either 51-63 months (offense level 24) according to the PSR or 41-51 months (offense level 22) as calculated by the defense. In either scenario, an analysis of factors under §3553(a) makes clear that a guideline sentence is far greater than necessary to achieve justice in this case. Rather, a below guideline sentence is appropriate and is respectfully requested.

## II.      Objection to PSR: Amount of Loss, p. 7 ¶16; p. 8 ¶24

### a.   *The Intended Loss falls between $550,000 and $1.5 million*

In its version of the offense, the government argues that there are three different methods for determining loss in this case: (1) the total amount paid to 350Green by the City of Chicago and state of Pennsylvania; (2) the amount the City of Chicago overpaid 350Green based on its cost sharing agreement; and (3) the total value of the grants. Under each method, the government asserts that the loss intended by Mr. Mason falls within the $1.5 million to $3.5 million range, thus warranting a 16-level increase in offense level.

---

presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance…After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing."

The probation department has adopted the government's first method for determining intended loss, that is, the total amount paid to 350Green. This equals $1,937,071.40, of which $1,747,071.40 came from the City of Chicago, and $190,000 came from the state of Pennsylvania. The defense submits this calculation is incorrect because, (1) a significant portion of this sum was not procured through fraud; and (2) 350Green is entitled to offsets for the money it paid to subcontractors (and thus rendered services to the City) prior to May 2012, the approximate date the fraud was discovered.[3]

350Green legitimately sought payment of $747,926.03 under the grant with the City of Chicago. Accordingly, this should be deducted from the probation department's loss amount. As is discussed in greater depth later in this sentencing memorandum, the fraud started when Mr. Mason began submitting fraudulent invoices and checks to the City, making it seem as though he had already paid vendors and subcontractors.[4] This, however, did not begin until approximately November 2011.

The government has recently provided a draft workpaper (attached as Exhibit A) which charts checks written by 350Green to subcontractors and vendors. The workpaper shows both the date the check was written, as well as the date the check cleared. All of the checks written prior to November 28, 2011 cleared within 11 days of being written. This indicates that 350Green did, in fact, send those checks to its subcontractors without waiting to be reimbursed by the City—in other words, what is was supposed to do under the contract. So, prior to this point, it appears that 350Green did not procure the grant money it requested—$504,899.63— through fraud. Consequently, this amount should be deducted from the probation department's

---

[3] All of the government's proposed calculations are based on intended loss. The government has not yet taken a position regarding actual loss or restitution. (Gov. Vers. p. 14)

[4] As the plea agreement indicates, "Mason was told by Chicago personnel in September 201-l that in order to obtain grant funds from Chicago, 350Green was required to submit proof that it had paid its subcontractors and vendors." (Docket 67, p. 3)

loss amount.

Additionally, Mr. Mason did not procure all of the post-November 28, 2011 funds through fraud. The workpaper shows that there are eleven post-November 28, 2011 checks that cleared within 14 days of being written. It is reasonable to infer that these checks were not used in a fraudulent manner to secure prepayments from the city; rather, they were sent to subcontractors and vendors shortly after being written. The sum of these checks— $243,026.40—should likewise be deducted from the loss amount total. In short, while Mr. Mason did begin engaging in pre-payment, the records indicate he did not do so immediately after learning that he must pay subcontractors before invoicing, and did not do so in every instance.

Finally, pursuant to U.S.S.G. § 2B1.1 cmt. n. 3(E)(i), the loss amount should be reduced by "the fair market value of the…services rendered by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." Here, the services are those provided by the subcontractors and vendors as performance on the Chicago grant. Accordingly, Mr. Mason should receive credit for the amount of money paid to subcontractors after the fraud began but prior to its detection in approximately May 2012. (PSR, p. 6 ¶14) Based on the checks listed on the government's workpaper, these payments total $130,278.70.

When these sums ($747,926.03 and $130,278.70) are deducted from probation's loss calculation of $1,937,071.40, the resulting total intended would be $1,058,866.67. This figure, the defense submits, represents a reasonable estimate of the loss amount.[5] Under this

---

[5] Loss calculations for Guidelines purposes, of course, need not be exact. USSG § 2B1.1, comment, n. 3(C). The offsets proposed by the defense are based on the workpaper provided by the government and which appears to include only checks and not payments 350Green made to subcontractors by wire transfer. Because the defense does not believe offsets based on wire transfers would impact the guideline level (that is would not take the intended loss to $550,000 or lower), counsel do not discuss them here. This is an issue, however, that may need to be taken up depending on the government's restitution calculation.

4

calculation, Mr. Mason should receive a 14-level increase under U.S.S.G § 2B1.1(b)(1)(H), as opposed to a 16-level increase, because the intended loss was between $550,000 and $1.5 million.

### b. The Government's Other Methods of Calculating Loss

The government's other proffered methods of calculating loss should be rejected. The government first claims that the City and 350Green agreed to a cost sharing agreement where the City would reimburse 350Green for approximately 28% of the cost of installing the charging stations. Based on this, the government argues, 350Green was only entitled to reimbursement for approximately $207,140 of its costs, and was hence overpaid by $1,539,930.52.

Per the contract with the City, the total budget for the equipment was $8,040,157, with 350Green providing $6,271,263 (approximately 78%) and the grant providing $1,768,894 (approximately 22%). *See* Contract Excerpt, attached as Exhibit B.[6] To the extent that the government is arguing that 350Green was only entitled to reimbursement in lockstep with the proportion of equipment funding the grant was to provide (because the grant only comprised 22% of the equipment funding, 350Green would only be entitled to reimbursement of 22% of its equipment costs per invoice), there is no support for that in the contract. Indeed, while the grant was to comprise about 22% of the *total* equipment funding, that proportion varied based on the category of equipment. Specifically, the budget envisioned that the grant would cover approximately 20% of the cost of the CharJit Express Plaza stations, approximately 33% of the cost of the Zip Car stations, and 50% of the cost of the I-Go stations.

Thus, to the extent that this budget was even binding and not merely a projected budget, the proper reimbursement amount cannot be determined by merely taking 22% of the total amount 350Green spent on equipment. Rather, a determination would have to be made by taking

an individualized look at each charging station installed, and calculating the reimbursable amount based on both its actual cost and equipment category: CharJit, Zip Car, or I-Go. Additionally, that reimbursement amount would change based on any non-equipment costs (e.g., personnel, data reporting, etc.) included in the invoice, because the grant was to be used to reimburse those as well. The government has not done this, and hence there is nothing to support its contention that 350Green was overpaid by $1,539,930.52.

Finally, the government submits that Mr. Mason submitted false claims to the City and other organizations, claiming that he had paid contractors, in an attempt to draw down the full amount of the grant funds. Thus, it alleges, the entire amount of the grants—over $3 million— should be used as the loss amount. The government fails to cite to any authority in support of its contention that loss should be calculated this way. It also fails to cite to any evidence that Mr. Mason intended to fraudulently draw down the full amount of every grant. As discussed herein, Mr. Mason did not form 350Green as a method of engaging in fraud. And, this calculation does not reflect the offsets for services actually rendered. Accordingly, this loss calculation should also be rejected.

## III.     Nature and Circumstances of the Offense

### a.     *Circumstances Surrounding the Offense*

As detailed in the factual basis of his guilty plea, Mr. Mason was a founder and President of a company, 350Green LLC, which was formed to engage in the business of installing and operating electric car charging stations. In the years prior to forming 350Green in 2010, Mr. Mason had become interested in the emerging green energy industry and has, as is attested in character letters submitted on his behalf, a devotion to the environment and to preserving the

environment through the development of alternative energy.[7]  He continues to work in this field today.  While Mr. Mason is devoted to clean energy, he does not have clean hands with regard to 350Green's financial dealings and conduct with regard to grants provided by municipalities, including Chicago. As his plea agreement makes clear, Mr. Mason engaged in fraud as part of his operation of 350Green and he accepts responsibility for, and is ashamed of his conduct.  As he intends to make clear to the Court at the time of sentencing, he was responsible for and was entrusted by 350Green employees and public officials to act in an ethical and scrupulously honest manner when it came to 350Green's implementation of grants and financial dealings.  To his everlasting regret he failed to do so.

Counsel believe, however, that in fashioning an appropriate sentence it is important for the Court to understand the nature of Mr. Mason's fraud and the impetus behind it not because it excuses his conduct, but because it distinguishes Mr. Mason from many defendants who find themselves convicted of fraud in the federal court – con men, profiteers, and others who are motivated by excessive greed and intend to grab as much money as they can and run off with it. Mr. Mason is convicted of fraud, but he is not a base crook.  He did not run off with a pile of ill-gotten money nor did he intend to do so.  Rather, when 350Green's debt began to outpace its income and it became clear that 350Green would have difficulty performing on its grant obligations and paying subcontractors in a timely fashion, Mr. Mason failed to do what he should have done.[8]  He did not advise the municipalities of the financial difficulties and determine, along with them, whether 350Green should continue trying to complete the grants or whether

---

[7] Counsel have provided to the Court, government and Probation Department a series of character letters on Mr. Mason's behalf.

[8] *See*, Plea Agreement, Docket 67, p. 4.  "350Green performed on the Chicago and Pennsylvania contracts for a period of time. Beginning in approximately September 2011, 350Green's debts outpaced its income. Mason devised a scheme to obtain grant funds to which 350Green was not entitled by submitting invoices to the governmental entities that represented that vendor and subcontractor payments had been made, when in fact those subcontractors and vendors had not been paid."

alternative plans, for example a re-structuring of the grants or a sale that would allow another company to take over and complete work would be more appropriate.[9] Instead, Mr. Mason submitted and directed 350Green employees to submit false invoices and checks to the City of Chicago and other government agencies so that 350Green would receive grant funds to which it was not entitled. In short, he obtained grant funds by pre-billing for subcontractor work when he was required in most instances to pay the subcontractors first.

Although he rationalized his actions at the time as a way to complete the grant work and maintain 350Green as a viable business, Mr. Mason acknowledges that he put the City and other municipalities at significant financial risk by pre-billing for subcontractors' work. He also misrepresented 350Green's financial state, reasons it was late making payments, and exaggerated the likelihood of obtaining additional funding to complete work on the grant. For this conduct Mr. Mason stands convicted and is extremely remorseful. As explained below, however, his conduct taken as a whole is a far cry from the type of fraud that demands a custodial sentence to ensure just punishment and deterrence. He started 350Green with honest intentions, and when 350Green's finances finally collapsed, Mr. Mason made sure that its rights to the Chicago grant was sold to a company that could finish the grant. He has no criminal history whatsoever, and has been on bond for more than two years without a hint of trouble. He is and can continue to be a law-abiding and productive member of society.

          *i.*      *350Green did not Start as a Fraud*

350Green began as a legitimate business enterprise based on Mr. Mason and his partner's interest in the environment and the green energy industry. Mr. Mason and his partner were not wealthy, but they developed legitimate financing strategies designed to fund 350Green and its

---

[9]The Chicago grant in particular was valuable to other companies, and 350Green did ultimately sell its Chicago grant related assets (as an assumption of liabilities with no money going to Mr. Mason for this sale) to another company that completed work on it. *See*, letter of John Pierce.

work on municipal grants. As the letter of attorney John Pierce makes clear, Mr. Mason hired and consulted with attorneys in efforts to obtain the predominate source of funding for 350Green; that is, renewable energy tax credits – a method of monetizing tax credits earned by one company's (350Green in this instance) sale of those credits to another company. As Mr. Pierce explains, these tax credit sales ultimately did not come to fruition primarily because the tax credits were first reduced, then expired and were only renewed after it was too late for 350Green to implement them. The electric car market also did not proceed as expected. That 350Green's funding depended significantly on the sale of tax credits was not a mystery however. As 350Green's bid on the Chicago grant makes clear, 350Green expressly stated that it "intended to monetize the Federal Alternative Fuel Infrastructure Tax Credit in order to finance the Chicago infrastructure investment." *See*, Grant Proposal excerpt, attached as Exhibit C. 350Green also provided details of projected funding for the Chicago project indicating that it was projecting tax credits in excess of $4 million – approximately 50% of the total funding. *See*, Ex. C. The government does not appear to dispute that 350Green notified the City of its intended tax credit financing for the majority of the Chicago project, and does not appear to dispute that 350Green did actually pursue tax credit investment funding. (Gov. Vers., p. 11)

The government's version does argue, though, that 350Green submitted "rosy financial projections" in support of its grant application with the City. (Gov. Vers., p. 10) Although it acknowledges that these figures at issue were explicitly couched as "projections" and "anticipated" future earnings, the government appears to argue that 350Green did not have a good faith basis to believe it had any chance of achieving the projected financial goals. This contention is belied by documentary evidence, as well as 350Green's initial financial success.

In its August 19, 2010 grant proposal, 350Green stated it anticipated having $1,953,608

9

in cash and assets at the close of the year - December 31, 2010. *See* Ex. C. Mr. Mason did not pull this number out of thin air. Rather, as the grant proposal states, this projection was based on (1) expected tax credits; and (2) 350Green's plan to seek investments from organizations and businesses for the opportunity to co-sponsor charging stations. *See* Ex. C.

The government also asserts that 350Green, itself, was to make a $1 million cash investment in the Chicago project—something that the government believes it did not have the financial ability to do based on the balances in Mr. Mason and Ms. Gerzanych's personal bank accounts. (Gov. Vers., pp. 10-11) It was never suggested, however, that funding for the project would come directly from Mr. Mason or his partner's pockets - the $1 million was to come from outside, corporate investors. The "owner's equity" referenced in the balance sheet (Ex. C) was simply another way of saying "stockholders' equity." Indeed, by June 2011, 350Green had secured $2 million in funding from Walgreens. *See* Contract and Press Release, attached as Exhibit D. By the end of 2011, it had raised additional funding from Simon Property Group. *See* Press Releases, attached as Exhibit E. 350Green also still hoped to obtain tax credit funding. Thus, while 350Green was unable to meet its financial projections by December 31, 2010, the fact that it raised approximately $3 million (far more than the 2010 projection) some months later is an indication that the initial projection was made in good faith.

Although the government has not argued it, Mr. Mason's ultimate use of a company called "Actium Power" to obtain pre-payment from the City also does not indicate that 350Green was designed to commit fraud from the outset. As is made clear in the plea agreement's factual basis, part of Mr. Mason's pre-payment fraud was completed through the use of Actium Power, a company which had no assets, business address, or even a bank account. Mr. Mason used Actium power as part of pre-payment fraud to make it appear that 350Green had paid for electric

10

car charging stations when it, in fact, had not yet paid. Again, Mr. Mason fully admits and regrets this conduct. But the existence of Actium power does not indicate that Mr. Mason or 350Green intended fraud from the outset. Rather, Actium Power was originally designed as a special purpose company to execute the tax credit sales. As Mr. Pierce's letter explains, this sort of company is common for tax credit transactions.

In sum, Mr. Mason did not create 350Green to engage in fraud, nor did he personally intend to engage in fraud from the outset. The pre-payment fraud began when tax credit financing fell through, and 350Green's finances deteriorated. The defense respectfully submits that his punishment should fit the reality of his conduct – good intentions gone awry and an intent to misuse and put at risk the municipalities' funds not an intent to run off with them.

ii.     *Prepayment Requirement*

As discussed above, the biggest reason why 350Green began experiencing financial difficulties was because of the reduction and eventual cancellation of the Alternative Fuel Infrastructure Tax Credit. 350Green's planned monetization of the tax credit at its original 50% level constituted the predominate funding source for the installation of charging stations in Chicago and elsewhere. Additionally, however, at least some of 350Green's financial problems were caused by confusion over the requirement that 350Green must pay subcontractors *before* being reimbursed by the City.

Mr. Mason acknowledges that, on September 26, 2011, he was made definitively aware by the Chicago officials that 350Green had to incur costs from its subcontractors *and* pay them before the City would reimburse 350Green for those costs. He also acknowledges that after September 26, 2011, instead of explaining to the City that 350Green could not go forward under those terms, he began submitting fraudulent documents to the City which made it seem as though

11

350Green had already paid its subcontractors. Prior to September 26, 2011, however, the prepayment requirement was unclear, and Mr. Mason reasonably believed he only had to incur costs before he could seek reimbursement.

In part, the language of the grant contract do not clearly state that costs must be incurred and paid prior to 350Green's ability to invoice the City.[10] The contract states that "requisitions for reimbursement identifying the payment due for the Services performed and/or costs incurred and paid directly by [350Green]" and that "the City will reject any reimbursement invoice for costs incurred or paid by any party other than [350Green]." *See,* Contract Reimbursement Provision, attached as Exhibit F. The contract does not, on its face, require prepayment for *services* performed in furtherance of the project. And, as to costs, because of the second sentence specifically prohibiting 350Green from seeking reimbursement of costs "incurred or paid" by another party, Mr. Mason interpreted the phrase "costs incurred and paid directly by [350Green]" in the first sentence as requiring only that 350Green, and not someone else, incur the costs prior to seeking reimbursement, not that 350Green actually pay for those costs prior to reimbursement as well. He expressed this view in a September 23, 2011 email to Samantha Bingham, who managed the grant for the City. *See* E-Mail Chain, attached as Exhibit G. It was not until September 26, 2011 that he learned from Ms. Bingham, who spoke with the lawyer who drafted the grant, that the contract required 350Green to prepay its subcontractors before seeking reimbursement. *See,* Ex. G.

In addition to the contract's language, the City's own Subcontractor Payment Certification form required contractors like 350Green to certify under penalty of perjury that "[the] company is obligated to pay any and all subcontractors identified above within **14 days** of

---

[10] Mr. Mason is not blaming the City for his confusion. The language of the documents referenced herein, however, make clear that Mr. Mason had a good faith belief prior to September 26, 2011, that payment was not required before invoicing.

receipt of payment from the City of Chicago." *See* Subcontractor Payment Certification, attached as Exhibit H (emphasis in the original). This language clearly allowed for, and anticipated, that contractors like 350Green would pay their subcontractors *after* being reimbursed by the City. And, though the City ultimately informed Mr. Mason that the contract required prepayment of the subcontractors, the contract language combined with the Subcontractor Payment Certification form led Mr. Mason to believe otherwise.

Again, Mr. Mason's pre-payment fraud was not designed or intended from the outset. It resulted from unexpected financial distress and a misunderstanding of the terms of the Chicago grant. His response to those issues was wrong and fraudulent, but he did not set out to defraud.

### iii. 350Green was Not a Ponzi Scheme

Mr. Mason admits that 350Green sought additional governmental grants during the time it was experiencing financial uncertainty. Mr. Mason acknowledges that this was wrong, but contrary to the suggestion in the government's version of the offense (Gov. Vers., pp. 10-11) it was not an attempt to turn 350Green into a Ponzi scheme. Put another way, he did not intend to repay subcontractors to whom 350Green already owed money using new grant funds. Rather, he hoped, as a result of the grants, to attract additional corporate investors in the same vein as Walgreens and Simon Property Group. Additional corporate investments would, Mr. Mason believed, give 350Green the capital it needed to stay afloat and perform the work it had committed to under the grants. Moreover, this was not some "pie in the sky" idea. Given that 350Green had been able to raise millions of dollars in corporate investments in 2011, it was not outside the realm of possibility that it could do so again.

iv.     *Mr. Mason did not Attempt to Destroy Evidence*

Neither the government (Gov. Vers. p. 9) nor the PSR (PSR p. 7) seek to enhance Mr. Mason's sentence based on the deletion of Quickbook entries.  The defense, of course, agrees that an obstruction enhancement is not appropriate.  More to the point, and as the Court may consider all of his conduct under § 3553, Mr. Mason did not delete Actium Power invoices from 350Green's Quickbooks account with any intent to hide them.  350 Green used the online version of Quickbooks which has an audit trail function.[11]  The audit trail function lists all the changes made (including deletions) and by whom, and the audit trail function cannot be turned off.  *See*,  https://community.intuit.com/articles/1145290-how-can-i-turn-off-the-audit-log-with-quickbooks-online.  Mr. Mason has a degree in accounting and was well aware of this.  Moreover, paper copies of the Actium Power invoices had been sent out to the City, and deleting them from 350Green's Quickbooks would not have hidden them in any way.  As the government notes, all the paper documents related to Actium Power were also still in 350Green's offices when the FBI conducted a search warrant.  (Gov. Vers. p. 9)  The reality is that when Mr. Mason deleted the invoices from Quickbooks, he was in the process of preparing 350Green for sale to another company.  He was simply correcting the Quickbooks so that the purchasing company would have accurate and legitimate records.

v.     *The City Was Not to Profit from the Grant & Did Receive 168 Installed Chargers and 51 Chargers from Inventory*

In its Version of the Offense, the government argues that "the governmental agencies he defrauded have seen no profit from defendant's fraud. These costs are ultimately born by the taxpayers." (Gov. Vers. p. 14)  Here, and as is most explicit regarding the Chicago grant, there was to be no financial profit to the City that was lost as a result of Mr. Mason's actions.  The

---

[11] It appears the audit trail function is what investigators used to locate the deletions.

14

purpose of the Chicago's role in the grant was not to provide profit to the City, but to serve as a "catalyst for market transformation, leading by example in its own operations and encouraging the private sector to bring about significant and sustainable use of alternative fuels and advanced vehicle technologies." *See*, City Documents excerpts, attached as Exhibit I. Questions and Answers publicly posted related to the grant also make Clear that Chicago was not intended to profit financially:

> **Q:** **Does the city expect a return on investment or revenue from the charging stations?**
>
> **A:** As stated on page 4 of the RFP, "The City has established this funding as an incentive to attract private investment in charging infrastructure and the network that supports it, rather than owning and operating the infrastructure itself."

*See*, Ex. I.

Moreover, as is made clear by 350Green's sale of its rights under the Chicago Grant to JNS Power and Control Systems, Inc., the City did receive 168 completed and installed car charging stations as well as 51 charging stations from 350 Green's inventory. *See*, JNS Purchase Agreement, attached as Exhibit J.[12] While 350Green did not meet its promised goal of 270 installed charging stations, they made significant progress towards it, and Mr. Mason did insure that 350Green's grant rights were transferred to a company capable of completing work on the grant.

None of this is to say, however, that there was no impact on the City or other municipalities. The government is no doubt correct that Mr. Mason's conduct harms public confidence in these types of programs. Because of his deep interest in clean energy and the development of that industry, Mr. Mason is acutely aware of and remorseful for that harm.

---

[12] The sale and sale agreement were reviewed and accepted by the City prior to the sale being finalized.

vi.    *Mr. Mason Did Not Significantly Profit*

As noted herein, Mr. Mason did not run off with public money, nor is he sitting on a pile of accumulated wealth as a result of his conduct.  He filed for personal bankruptcy in January 2014.  In the year 2011, the only full year of the Chicago grant, he received $95,000 as salary from 350Green.  In March of 2012, while the company was struggling financially, Mr. Mason loaned $18,000 back to 350Green in an effort to help it recover.  It did not recover, and he has not been repaid.  In addition, while 350 Green was sold to another company (absent the right to the Chicago grant which was sold to JNS Power for a liability assumption and no money going to Mr. Mason or 350Green), Mr. Mason received approximately $90,000 as a result of that sale.[13]

b.    *The Fraud Guidelines*

Amendments to the U.S. Sentencing Guidelines have dramatically increased the advisory sentencing ranges for defendants in economic crime cases with high loss amounts.  Over the last fifteen years, the Sentencing Commission has implemented several new specific offense characteristics in § 2B1.1, and increased existing enhancements. Wire fraud is undoubtedly a serious crime.  However, a significant number of judges nationwide have concluded that the newer, more severe sentencing guidelines result in sentences that are greater than necessary, and inconsistent with the purposes of punishment under § 3553(a).

For example, nationwide in 2016, 29.1% of defendants sentenced for fraud received below guideline sentences.[14]  *See Statistical Information Packet, Fiscal Year 2016, Northern District of Illinois,* U.S. Sentencing Commission, at pp. 18-19.  In the Northern District of Illinois, where loss amounts (and thus guideline ranges) in fraud cases are generally higher than

---

[13] Mr. Mason and his partner were owed additionally money as the result of the sale, but do not have any expectation of receiving that money or any means to seek to obtain it.
[14] This excludes government-sponsored below guideline sentences, such as departures under U.S.S.G. § 5K1.1.

nationwide means and medians[15], 56.2% of fraud defendants received below-guideline

sentences.[16] *Id.* Similarly, in the Eastern District of New York, where median loss amounts are

even higher, 44.2% of fraud defendants received below guideline sentences. *See Statistical*

*Information Packet, Fiscal Year 2016, Eastern District of New York,* U.S. Sentencing

Commission, at pp. 18-19.[17]

The reason behind this sentencing trend may be that the fraud guideline is not based on

empirical evidence and does not "reflect a rough approximation of sentence[s] that might achieve

3553(a)'s objectives. *Rita*, 551 U.S. at 350; *United States v. Kimbrough*, 552 U.S. 85, 89 (2007);

*United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013). Rather, the guidelines "tend to place

great weight on putatively measurable quantities…such as the amount of financial loss in fraud

cases, without…explaining why it is appropriate to accord such huge weight to such factors."

*United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. July 20, 2006)(Rakoff, J).

In some cases, placing such emphasis on loss amount is inappropriate. For example, in

this case, Mr. Mason's guidelines are increased significantly by the *intended* loss, i.e., the

amount of money put at risk as a result of the offense. However, consideration of intended loss

in a vacuum fails to take into account the fact that there was very little actual loss because

350Green eventually sold its contract with the City to another company, which made good on

350Green's liabilities.[18] Mr. Mason was actively involved in this sale, the terms of which

ensured that the grant obligations to Chicago and other municipalities would be met by the

successor companies. The fraud guidelines' failure to consider mitigating factors such as this

---

[15] *See Symposium on Economic Crime 2013: Number of §2B1.1 Cases in Each Federal Judicial District with Mean and Median Loss Amounts for Fiscal Year* 2012, U.S. Sentencing Commission, http://www.ussc.gov/research-and-publications/research-projects-and-surveys/economic-crimes/united-states-sentencing-commissionsymposium-economic-crime.
[16] Again, excluding government-sponsored below guideline sentences.
[17] Same as above.
[18] The government has not yet provided its position on restitution or actual loss. If the government proves there is an actual loss, this may change this calculation. (Gov. Vers. p. 14)

one seems contrary to their goal of accurately reflecting the seriousness of economic offenses.

Recognizing the fraud guideline's infirmities, in 2014, a special task force of the American Bar Association ("ABA"), comprised of judges, law professors and lawyers, proposed to the Sentencing Commission amendments to § 2B1.1. *See* ABA Report, attached as Exhibit K. The ABA's proposed guideline begins with a base offense level, and then requires a sentencing court to make specific calculations relating to: (1) actual loss (intended loss is not considered); (2) culpability; and (3) victim impact. *See* Ex. K.

Were the ABA's proposed guidelines applied in this case, even assuming several aggravating enhancements, Mr. Mason's advisory guideline range would be significantly lower than it is under the 2016 guidelines.

| ABA Guidelines | Mr. Mason |
|---|---|
| Base Offense Level | 7 |
| Loss | 0 |
| Culpability | 3 |
| Victim Impact | 2 |
| Special Offense Considerations | 0 |
| Acceptance of responsibility | -3 |
| **Total** | 9 <br><br> (4-10 months) |

Though any sentence of imprisonment would be a significant sentence for Mr. Mason, who has no criminal history and has never even spent a night in jail—the advisory sentencing range under the ABA guidelines is considerably more reasonable than the advisory sentencing range under the 2016 guidelines. Mr. Mason requests that the Court consider the ABA guidelines and reject

the irrationally high sentencing range suggested by the current guidelines.

## III.   History and Characteristics of the Defendant

### a.      *Mr. Mason's Lack of Criminal History*

Importantly, this case represents Mr. Mason's first conviction. The United States

Sentencing Commission has conducted numerous studies demonstrating that individuals facing

their first term of incarceration are a remarkably low risk to recidivate. The fact that he has no

prior convictions places Mr. Mason in the category of those least likely to commit further crimes.

*A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S.*

*Parole Commission Salient Factors Score*, U.S. Sentencing Commission, pp. 14-15 (January 4,

2005) (suggesting that Criminal History Category I does not adequately take into account the

lack of recidivism for first time offenders). Indeed, because of the Commission's research on this

subject, it is considering amending the guidelines to reflect the lower risk of recidivism that first-

offenders, like Mr. Mason, pose. *Proposed Amendments to the U.S. Sentencing Guidelines,* U.S.

Sentencing Commission, pp. 20-24 (August 25, 2017)  Under the 2017 proposed amendments,

Mr. Mason would receive a one-level decrease in offense level based on his status as a first time

offender. *Id.*, p. 23.

Likewise, defendants such as Mr. Mason who have never before been incarcerated

generally require a shorter term of imprisonment to achieve the same goal of protecting the

public from further crimes of the defendant. *See*, *United States v. Baker*, 445 F.3d 987, 992 (7th

Cir. 2006); *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D.Wisc. June 11, 2005)

(Adelman, J.).  The position that Mr. Mason finds himself in today, convicted of a federal

offense, facing a possible prison sentence and the daunting task of rebuilding his life afterwards,

is already punitive. This, in and of itself, should assure the Court that he will never again run

afoul of the law.

> b. *Mr. Mason's Good Character*

So too should the letters submitted by Mr. Mason's family and friends, who have remained supportive despite learning of his involvement in the offense. These letters are a testament to Mr. Mason's good character and selflessness.[19]

Many of the letters recount Mr. Mason's kindness and compassion for others and how he has played the role of a responsible caretaker throughout his life. For example, Mr. Mason's brother, Michael, recounts that while Mr. Mason was in grammar school, their mother was injured. This injury occurred shortly after Mr. Mason's father died unexpectedly (something that affected Mr. Mason profoundly), leaving no one but Mr. Mason to care for his mother. Despite his young age, Michael writes that Mr. Mason "looked after and cared for Mom throughout her recovery. He continued this role through high school and college."

Mr. Mason's mother-in-law, Natalia Abplanalp, recounts Mr. Mason's selflessness and compassion after her husband's suicide. She writes,

> Now looking back I don't know what we would have done without Tim…Back in June 2014, Tim was the one that pulled me and Mariana through the most difficult moment of our lives. He remained strongest and worked very hard to put the affairs in order. He flew back with me to our home town and stayed until affairs were mostly organized.
>
> Throughout the years that I've known Tim, he always put other people in front of his needs. I saw him do it with me and my tragedy. He is caring, generous and kind person.

Additionally, many of the letter writers describe Mr. Mason's true remorse for his commission of the instant offense—something that differentiates him from many other fraud defendants who appear before this Court for sentencing. For example, his brother Michael writes

---

[19] Hard copies of these letters will be delivered to the Court.

that, during their talks and visits, "Tim takes the opportunity to express to me his sorrow and

regret for his actions." Mr. Mason's lifelong friend, N.L. Polidoro Hughes, writes,

> My respect for Tim, his introspection, and his honesty has risen consistently…Strange as this may sound, my respect spiked when he called to talk to me about the charges against him and his decision to plead guilty. He offered no excuses; he admitted to making a serious mistake, and expressed much regret over any embarrassment inflicted upon those of us who love and support him.

As these and the other letters illustrate, Mr. Mason should not be defined solely by his

involvement in this offense. Rather, the actions he has taken over the course of his lifetime

demonstrate that he is compassionate, responsible, introspective, and supportive. These positive

characteristics should be taken into account under § 3553(a).

## VI.    Conclusion

For all of the reasons stated above, a guideline sentence is greater than necessary to

satisfy the purposes of sentencing under § 3553(a). Instead, it is respectfully requested that this

Court impose a below guidelines sentence.

Respectfully submitted,

 s/ Patrick W. Blegen
**PATRICK W. BLEGEN**, Attorney for
Defendant Timothy Mason.

**BLEGEN & GARVEY**
53 West Jackson Boulevard, Suite 1437
Chicago, Illinois 60604
(312) 957-0100

21