UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 15 CR 102 |
| v. | ) | |
| | ) | Hon. Sharon Johnson Coleman |
| TIMOTHY MASON | ) | District Judge |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM**

Defendant Tim Mason played a shell game with public financing for his own benefit. Using financial statements that bordered on fictional, he obtained federal and state grants to install electric charging vehicle infrastructure, promising that his start-up company, 350Green, would finance the vast majority of the project costs. When Mason's financial predictions fell short, he submitted false and fraudulent invoices to the City of Chicago and three other governmental entities claiming to be owed reimbursement for expenses that 350Green had not, in fact, made. He made numerous and repeated false statements regarding 350Green's finances in order to conceal his fraud. Even after his fraud was discovered, Mason continued to falsely represent that his invoices were accurate and denied any wrongdoing. Mason blamed his own employees, among others, for any problems with the invoices, and accused his principal supplier, Manufacturer A, of breach of contract. Only upon facing trial in this matter did Mason acknowledge – for the first time – that not only had he submitted false and fraudulent invoices, but that he had lied and misled not only the governmental entities but also his own business partner, in order to conceal the scope of his fraud.

1

Mason's words and actions demonstrate that his fraud was not accidental, or a momentary lapse of judgment, but instead a sustained campaign by an individual who values his personal success over his contractual and ethical obligations. His fraud caused incalculable damage to electric charging infrastructure projects here in the Chicagoland area as well as in other parts of the country. The inability of these entities – in particular, Chicago, the Pennsylvania Department of Environmental Protection (PADEP), and the Association of Bay Area Governments (ABAG) – to timely and fully complete their car charging infrastructure not only hinders public and private investment in alternate energy sources, but also contributes to the public's perception that government cannot efficiently complete infrastructure projects. Mason's calculated and sustained fraud warrants a sentence of imprisonment within the Guidelines range of 51-63 months in order to reflect the seriousness of the offense, provide just punishment, and deter others from committing similar crimes.

## I.  OVERVIEW OF OFFENSE CONDUCT

Mason and his partner, Mariana Gerzanych, were the principals of 350Green, a firm which held itself out to be experienced in the installation of electric charging vehicle infrastructure. Mason served as president of 350Green, while Gerzanych held the title of chief executive officer of 350Green, although both were equal partners in the company. Mason and Gerzanych divided responsibility within the company, with Mason responsible for business growth and financial management, and Gerzanych responsible for public relations, marketing, and overseeing the technical aspects of PEV charger installation.

Mason and Gerzanych, as 350Green, applied for, and were awarded, contracts with cities, states, and other units of government, to install and operate plug-in electric vehicle charging stations. These contracts contemplated a public-private partnership in which the private company and the governmental entities would share the total cost of the projects. Between 2010 and 2012, 350Green was awarded contracts with the City of Chicago ("Chicago"), the Bay Area Air Quality Management District ("BAAQMD"), the Pennsylvania Department of Environmental Protection ("PADEP"), and the Association of Bay Area Governments ("ABAG") (collectively, the governmental agencies). As a part of these contracts, 350Green committed to contribute, from various sources, between three to six times as much money as the governments were to contribute via grant funds in order to complete the projects. Of these contracts, the Chicago contract was the first and the largest in scope.

350Green soon ran into financial difficulties in the Chicago project as their projected investment and financing failed to materialize. Instead of renegotiating contract terms or seeking additional funding, Mason embarked on a scheme to fraudulently draw down on the grant funds, first from Chicago, and later from other governmental entities, in order to keep 350Green afloat. Mason directed 350Green employees to submit two types of false invoices to Chicago and the other governmental agencies:

1.     The first type of false invoice consisted of legitimate invoices from subcontractors and vendors who were working on the contract, along with copies of checks purportedly issued to the subcontractors or vendors, but which in fact had not

been sent to them. Mason submitted and caused these invoices and checks to be submitted because he knew that the governmental entities would not release grant funds to 350Green unless he could supply proof of payment. Mason then received the grant funds, and eventually paid most of the subcontractors or vendors for the sums as reflected on the particular invoices submitted to the governmental entities.

2. The second type of false invoice were entirely false invoices created at Mason's direction, which falsely claimed that 350Green had purchased and paid for DC fast chargers (a type of electric vehicle charger) from a company called Actium Power. These electric vehicle chargers were the core of the project – they were the actual devices to which consumers could plug in their cars and charge them while they were away from home.

More specifically, Mason directed Employee B to create false invoices that, purported to show that "Actium Power" had supplied DC fast chargers to 350Green. At Mason's direction, the invoices represented that Actium Power's business address was the address of Manufacturer A, the actual manufacturer of the DC fast chargers and that Actium Power was the "exclusive North American Dealer for Manufacturer A." However, "Actium Power", a company incorporated by Mason and Gerzanych, was a company in name only, had no assets, liabilities, or business. Actium Power was not the "exclusive North American distributor" for Manufacturer A, and no distribution agreement had been entered into between 350Green, Actium Power, and/or Manufacturer A.

4

Mason told Employee B how many chargers and related equipment should be listed on the invoice, and what price to assign to each of those items. These prices were double what Manufacturer A was actually charging 350Green for the electric vehicle chargers.

Mason further directed Employee B to create checks using 350Green's check stock, which purported to show that 350Green had issued checks in payment to Actium Power for the chargers supplied pursuant to the Actium Power invoices. However, Mason knew that 350Green had obtained the DC fast chargers directly from Manufacturer A and that neither 350Green nor Actium Power had paid Manufacturer A for the DC fast chargers.

Mason assured Employee B that Actium Power was a legitimate company and that there was no problem with Employee B creating the invoices. Mason directed Employee B, and later directed other employees, as well as Gerzanych, to submit invoices to the governmental agencies which contained the false and fraudulent Actium Power invoices. Mason did so knowing that the true manufacturer of the chargers was never paid.

Mason's financial house of cards began to collapse in the spring of 2012. In late March 2012, subcontractors on the Chicago project stopped work due to 350Green's failure to pay. Chicago personnel, who had been releasing grant funds in reliance on 350Green's representations that it was paying its subcontractors, held a series of meetings with Mason and Gerzanych. During that time, Mason made numerous false representations to Chicago personnel and to subcontractors regarding 350Green's

financial health and the reasons for non-payment. While subcontractors resumed work for a short period of time in reliance on those representations, continued failure to pay led them to stop work. Ultimately, Chicago terminated the contract with 350Green.

While Chicago was investigating 350Green's finances and the provision of false and fraudulent invoices, Mason continued his fraud. Mason continued to seek payment (and retain payment) from governmental entities for expenses that included the false Actium Power invoices. Mason further continued to represent, falsely, to other governmental agencies as well as the public, that no fraud had occurred, that 350Green had invested millions in private capital funds in its electric charging vehicle contracts, and that 350Green was securing additional financing to resolve its temporary cash flow problems. Mason also claimed that Manufacturer A was falsely denying association with Actium Power, and that Actium Power was in fact the distributor for Manufacturer A, such that no fraud had actually occurred.

## II. THE ADVISORY GUIDELINES RANGE

### A. Probation Office's Guidelines Calculation

Mason pleaded guilty by way of plea agreement to wire fraud, as charged in Count 1 of the indictment. The United States Probation Office, using the November 2016 Guidelines Manual, calculated Mason's Guidelines range as follows:

| | |
|---|---|
| 7 | Base offense level, pursuant to USSG § 2B1.1(a)(1) |
| 16 | More than $1.5 million, but less than $3.5 million in loss resulting from the offense, pursuant to USSG § 2B1.1(b)(1)(I) |
| 2 | Sophisticated means, pursuant to USSG § 2B1.1(10)(c) |
| 3 | Leader/organizer or criminal activity, pursuant to USSG § 3C1.1 |
| -3 | Acceptance of responsibility, pursuant to USSG § 3E1.1 |

      **27**    **Total Offense Level**

PSR at 7-8. Combined with Mason's criminal history category of I, the Probation Office calculated that Mason's advisory Guidelines range is 51-63 months' imprisonment. PSR at 9, 17.

    The government does not object to the Probation Office's calculation of the Guidelines range and does not have any further objections to the presentence report.

      **B.**    **Calculation of Loss**

    Probation, the government, and Mason have each used different methods to arrive at a loss amount in this case. Both the Probation Office and the government found that his fraud caused intended losses of more than $1.5 million but less than $3.5 million. Mason objects to these calculations, contending that since 350Green actually paid subcontractors approximately $900,000, those sums should be credited against the loss, resulting in intended loss to the governmental entities of approximately $1 million.

    The Probation Office arrived at a figure of approximately $1.9 million in loss because that amount equals the amount of grant funds which the City of Chicago and the Pennsylvania Department of Environmental Protection (PADEP) paid 350Green, reasoning that, had 350Green disclosed that it was claiming funds to which it was not entitled, or accurately represented its financial condition and inability to pay subcontractors, neither Chicago nor PADEP would have paid 350Green any money pursuant to the contract.

    The government's loss calculation is supported by analysis of both intended and actual loss. Intended loss falls within $1.5 to $3.5 million under several methods

of calculation. First, the government agrees with the Probation Office that, had Mason revealed to Chicago that he was unable to make his cost share payments and was in financial straits, the City would have, as it did, cancel the contract. Second, intended loss can also be calculated by looking to the amount of false Actium Power invoices that were submitted to each of the governmental agencies in an effort to draw down on grant funds. Mason caused false and fraudulent Actium Power invoices claiming over $4 million to be submitted to the governmental entities. Had these entities credited those expenditures and provided reimbursement to the full extent of the funds remaining in those grants, Mason and 350Green would have received the full matching grant dollars from Chicago, PADEP, BAAQMD, and ABAG – a sum again well over $1.5 million.

Further, looking just to the sums disbursed by the governmental entities as the measure of intended loss overlooks that 350Green failed to contribute funds as it had promised during the life of the contract. This is most obvious when analyzing the invoices presented to Chicago.

350Green submitted invoices claiming it had paid the contractors and subcontractors over $2.8 million during the Chicago project, when its own bank records show that it had paid only approximately $739,000 – all of it from Chicago grant funds. Chicago and 350Green had a cost-sharing arrangement, meaning that Chicago would contribute no more than $1.9 million to the project, and 350Green

8

would contribute the remaining $6.8 million.[1] That is, then for every dollar that Chicago contributed to the project, 350Green was to match that with approximately $4.57 of its own funds. 350Green never contributed its match – it should have spent $3.3 million on the project by the time it had spent $739,000 in government funds. Thus, to "credit" 350Green for the approximately $739,000 in Chicago funds and approximately $190,000 in PADEP funds, ignores the fact that 350Green was entirely failing to fund its proportionate shares of the contract. When 350Green's failure to meet its contractual match is accounted for, the intended loss resulting from Mason's fraud is well over $1.5 million.

The government's loss calculation is also supported under an actual loss analysis. First, the governmental agencies suffered loss. Chicago incurred a $628,634.23 loss in funds it expended which the original grantors (the Department of Energy and the Illinois Department of Economic Opportunity) did not reimburse, along with salary and administrative costs incurred in an internal investigation and litigating grant settlements with the DOE and DCEO.[2] PA DEP incurred a $190,000 loss in grant funds it expended to pay the false and fraudulent Actium invoices.

Second, Mason drew down on grant funds primarily based on false claims that 350Green had purchased electric vehicle chargers. However, Manufacturer A was never paid for the chargers it supplied to 350Green. Manufacturer A (the original

---

[1] Defendant argues that the cost match for types of equipment varied under the contract. Regardless of that variation, the overall contract still contemplated a cost share of the total project costs.

[2] These funds were not reimbursed because the DOE and DCEO refused to reimburse where there was no evidence that any contractor/vendor was actually paid.

manufacturer of the chargers) is owed $405,973.89 not only for chargers for which it was never paid, but also for compensating other vendors for 350Green's failure to pay for the shipping and storage of the chargers.[3] *See United States v. Clark*, 787 F.3d 451, 463–64 (7th Cir. 2015) (holding that, even where defendant's false representations regarding payment were made to the government, defendant's employees still suffered loss when they were not compensated in the amount that defendant falsely represented to the government that they were paid).

Finally, Mason owes restitution to subcontractors who relied on his false statements concerning his reasons for failing to pay them for work on the Chicago project. Mason, as he admitted in his plea agreement, made and caused to be made false statements to subcontractors in order to conceal his fraud by inducing them to continue to work on the project. Those false statements were made principally after late March 2012, when all subcontractors stopped work due to nonpayment and Chicago threatened to terminate 350Green's contract. The uncompensated expenses of the Chicago contractors who continued to work on the project are also part of the actual loss, because those contractors relied upon Mason's false representations to their detriment.[4] *See United States v. Wilkozek*, 822 F.3d 364, 369 (7th Cir. 2016).

---

[3] This sum excludes attorney's fees and debt owed by 350Green to Manufacturer A under their separate Marketing Agreement.

[4] Extensive litigation followed the collapse of 350Green's participation in the Chicago project. JNS Power ultimately took over the Chicago project, although the project was never completed to the extent originally contemplated in 2010, when the original contract with 350Green was signed. Car Charging Group, which acquired 350Green, also engaged in extensive litigation regarding the debts of 350Green. Additional 350Green contractors also remain unpaid: Of those companies who responded to the government's inquiries, Company A is owed $381,360.89; Company B is owed $69,044.50; Company C is owed $6,810; and

Specifically, that is Company A, for work performed from April 3, 2012 onward, for a total of $293,880.84, and Company B, for work performed from April 16, 2012 onward, for a total of $19,144.50.

In total, therefore, actual loss of $1,537,633.46 also exceeds $1.5 million.

### III.   THE 3553(A) FACTORS WARRANT A SENTENCE WITHIN THE GUIDELINES RANGE

Criminal sentencing has four purposes - retribution, deterrence, incapacitation, and rehabilitation. *United States v. Milbourn*, 600 F.3d 808, 812 (7th Cir. 2010). Section 3553(a) requires the court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[5] A sentence within the Guidelines range is a fair and just sentence that takes into account the nature and circumstances of the offense as well as defendant's history and characteristics, and satisfies the purposes of sentencing, in particular the need to reflect the seriousness of the offense, to provide just punishment and to deter defendant and others.

#### A.   The Nature and Circumstances of the Offense

Mason argues that he merely engaged in what he describes as "prepayment fraud" because he did ultimately send most of the checks to his subcontractors.

---

Company D is owed $56,083.81. Documents substantiating these losses have been provided to the defendant as the government has received them.

[5] Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." §§ 3553(a)(2)(A)-(D).

"Prepayment fraud" is not some sort of lesser class of fraud, nor does it accurately capture Mason's fraudulent conduct. Mason knew the rules. He knew that he could only be reimbursed for project costs from grant funds. He decided to make false claims for reimbursement so that he could obtain funds to keep his business afloat on his terms, and so he could choose when, and if, he would reimburse his subcontractors and vendors. By doing so, he concealed from the governmental entities the fact that his company was not, and could not, contribute its contractual share of the projects, and strung along cities, states, and companies while he sought an exit strategy that would be profitable for him and his company.

Further, describing Mason's fraud as mere "prepayment" overlooks a significant aspect of his scheme - the creation and submission of wholly false invoices claiming entitlement to reimbursement for the purchase of vehicle chargers when Mason knew full well that the original manufacturer of the chargers had not been paid and was in fact never paid.

While Mason now claims to this Court that he never intended to defraud, these claims are contradicted by the web of deceit he wove while he repeatedly sought payment for the fraudulent Actium Power invoices, by made numerous false statements regarding 350Green's financial health, and deceived his own employees, including his partner, in taking part in his fraud.

When his scheme was exposed, he blamed his employees for clerical mistakes and falsely asserted that the Actium Power checks were legitimate and that the true manufacturer of the chargers had consented to the arrangement. He lied to his own

partner, Gerzanych, and directed her to make false representations to the City and to the state of Pennslyvania, regarding the legitimacy of the invoices submitted for payment as well as false statements to the public and other governmental entities regarding the state of 350Green's finances.

In particular, when the City of Chicago raised concerns about 350Green's financial health, Mason caused blatantly false financial statements to be provided to Chicago through his partner, Gerzanych. Those financial statements overrepresented, by millions of dollars, the true investment in 350Green. Mason further made false statements to Chicago officials, including by falsely claiming that 350Green had received lines of credit that they had not received.

Further, Mason directed Gerzanych to release a statement to the press and other granting agencies falsely claiming, among other things, that 350Green had "invested $4.6 million of private capital funds" when there is no evidence, whatsoever, of 350Green investing anywhere close to that amount. Instead, other than approximately $57,000 from Mason and Gerzanych and $25,000 from an independent investor, the only other significant deposits to 350Green's bank accounts were from governmental agencies and $2 million from a separate investment by Walgreens. Further, the statement falsely stated that 350Green was "in the final stages of closing new permanent financing that will allow us to finish the project." 350Green, at the time, was nowhere near obtaining a source for additional financing.

Further, Mason did not acknowledge the falsity of the Actium Power invoices. In particular, when PADEP officials pressed him to provide proof of payment to

Actium Power, he stalled them by repeatedly, and falsely, claiming that he had difficulty obtaining the cancelled checks. He supplied his business partner, Gerzanych, with an email that he directed her to send to PADEP officials falsely blaming the company's accountant for any billing issues. In addition, Mason maintained, in the face of all evidence to the contrary, to Chicago and to Manufacturer A, that Manufacturer A had, in fact, agreed to allow Actium to act as its distributor, and that as such, the invoices were not false.

Further aggravating Mason's conduct is that although he was running a startup company, he and Gerzanych lived well. Between June 20, 2011, and June 29, 2012, in addition to salary, he and Gerzanych benefited from $140,063 in auto, housing, and furniture expenses paid for out of 350Green's account. Those expenses included $37,685 on a used 2007 Mercedes CLS550 purchased for personal use, $26,196 on home furniture and $74,379 on rent payments for a $5,794 a month rental home (350Green had separate offices in downtown Los Angeles). These sums do not include thousands of dollars in what appear to be personal expenditures made using 350Green's debit cards. Further, Mason and Gerzanych personally profited from the sale of 350Green to Car Charging Group.

### B. Defendant's History and Characteristics

Mason has no criminal history. He has maintained gainful employment prior to the instant offense, and according to the PSR, maintains a strong network of friends and family. Mason's education and work history demonstrates that he has the education, and the experience, to understand that the representations he made in the course of this fraud were false, fraudulent, and unethical. Mason was not a neophyte

running his first business operation. Instead, he was an experienced businessman who fully understood what he was doing and possessed the skills and the knowledge to address his company's financial problems other than by fraud.

Although Mason's history indicates that he has not engaged in a pattern of fraudulent conduct, his actions in this case, particularly with respect to deceiving his own business partner and life partner, blaming his own employees for his own misconduct, and his repeated lies to the governmental agencies and subcontractors illustrate that Mason will say whatever he needs to say to get what he wants. This characteristic – of dishonesty – is extraordinarily serious and indicates that this Court's sentence should take into account the need to personally deter Mason from future fraudulent transactions.

### C. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment and Deterrence

This Court should impose a sentence within the Guidelines range to reflect the seriousness of the offense, promote respect for the law, and provide general deterrence. However well-intentioned Mason may have been when he incorporated 350Green, this Court should not sanction fraud as a legitimate remedy for business losses, especially when the public trust and the public fisc are the primary victims.

Mason took a risk when he incorporated 350Green. He entered into contracts anticipating, and hoping, that financing would materialize. When things did not go his way, he turned to fraud in the hopes of keeping the company afloat long enough to sell it at a profit. Certainly, 350Green did some work. But it did so almost entirely with public funds, in total contradiction of the public-private partnership it had

entered into with the governmental entities. Mason sold his company and earned a profit. The governmental entities, particularly Chicago, were not as fortunate. They never got the benefit of their bargain. Instead, they got delays, investigations, litigation, and the wasted opportunity to build a strong electric charging infrastructure in the Chicago region.

Mason urges this Court to disregard the advisory Guidelines and instead use the model ABA guidelines, because he argues that they more properly emphasize the actual loss, culpability of the defendant, and the victim impact. However, each of these three factors underscore the need for a serious sentence in this case. First, as discussed above, Mason's fraud caused actual loss of over $1.5 million. Second, Mason was the architect and director of this fraud, and misled and betrayed his own partner and employees by involving them in making fraudulent representations to the governmental entities. Finally, the victim impact is considerable even if it cannot easily be given a dollar value.

Mason's fraud had ripple effects which cannot be quantified. Certainly, the governments lost money. But they also lost something more – the opportunity to fully implement electric car charging infrastructure that would enable the United States to explore non-fossil fuel modes of transport. Mason's fraud resulted in the Chicago and Pennsylvania projects taking years longer to even partially complete. Mason's fraud sapped the time, energy, and funds from these entities that could have been otherwise used to further public transportation investment. Further, those subcontractors and vendors who dealt with Mason suffered significant financial

losses. Although Mason sold 350Green to Car Charging Group, some of the vendors and subcontractors with whom Mason dealt still remain unpaid. Mason has been discharged from Chapter 11 bankruptcy, but while Mason is walking away, those who did business with him will not be made whole.

Finally, a sentence within the advisory Guidelines range provides just punishment and specific deterrence. Mason, although he has no prior criminal history, has demonstrated his character to the Court through his conduct during the commission of this offense. As discussed above, he has shown a disturbing disregard for the truth and for his ethical obligations. He has manipulated others, including those closest to him, for his own ends.

A sentence within the Guidelines range is sufficient, but not greater than necessary given the scope, and particularly the circumstances, of Mason's fraud, to reflect the seriousness of the offense, promote respect for the law, and deter others from committing similar crimes.

## IV. SUPERVISED RELEASE

Pursuant to 18 U.S.C. § 3583(b)(2), the Court may impose a term of no more than three years of supervised release. The Guidelines provide for a term of supervised release of between 1 to 3 years, pursuant to Guideline 5D1.2(a)(2).

The government recommends that this Court impose a term of supervised release of 2 years, which is sufficient, but not greater than necessary, to accomplish the aims set forth in 18 U.S.C. § 3553(a) and § 3583. A two year term of supervised release provides a significant period during which Mason will be supervised as he reintegrates into society and provides the necessary structure and supervision to

ensure that Mason will make significant steps towards meeting his substantial restitution obligations.

The government does not object to the Probation Office's recommended conditions of supervised release.

## V. CONCLUSION

For the reasons set forth above and in its Government's Version of the Offense, the government respectfully requests that this Court impose a sentence within the Guidelines range.

                                                Respectfully submitted,
                                                JOEL R. LEVIN
                                                Acting United States Attorney

                                                By: <u>s/Maureen E. Merin</u>
                                                Assistant United States Attorney
                                                219 S. Dearborn Street
                                                Chicago, Illinois 60604
                                                (312) 353-1457